**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA, | : | |
| [UNDER SEAL] | : | |
| | : | CIVIL ACTION NO. \_\_\_\_ |
| Plaintiffs and Relator, | : | |
| | : | |
| v. | : | |
| | : | |
| [UNDER SEAL] | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE FALSE CLAIMS ACTS

|  |  |
|---|---|
| THE UNITED STATES OF AMERICA, the States or Commonwealths of CALIFORNIA, COLORADO, CONNECTICUT, FLORIDA, GEORGIA, HAWAII, ILLINOIS, MARYLAND, MASSACHUSETTS, MICHIGAN, NEW JERSEY, NEW YORK, NORTH CAROLINA, TEXAS, VIRGINIA, WASHINGTON, the DISTRICT OF COLUMBIA, and the LOUISIANA MEDICAL ASSISTANCE PROGRAMS, *ex rel.* LPF, LLC, | CIVIL ACTION NO. ____ |

Plaintiffs and Relator,

v.

MIRACA LIFE SCIENCES, INC. and MODERNIZING MEDICINE, INC.,

Defendants.

**COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE FALSE CLAIMS ACTS**

## I.    INTRODUCTION

1.    Relator LPF, LLC brings this action on behalf of the United States, several states, and itself against Defendants Miraca Life Sciences, Inc. ("Miraca") and Modernizing Medicine, Inc. ("ModMed") to recover damages and civil penalties under the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended (the "FCA") and its state-law counterparts, the California False Claims Act, Cal. Gov. Code § 12650 *et seq.*; the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-305, *et seq.;* the Connecticut False Claims Act for Medical Assistance Programs, Conn. Gen Stat. § 17b-301a, *et seq.*; the District of Columbia False Claims Act, D.C. Code § 2-381, *et seq.;* the Florida False Claims Act, Fla. Stat. § 68.082(2), *et seq.*; the Georgia

False Medicaid Claims Act, Ga. Code § 49-4-168, *et seq.*; the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21(a), *et seq.*; the Illinois False Claims Act, 740 Ill. Comp. Stat. § 175/3(a), *et seq.*; the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. § 46:437, *et seq.*; the Maryland False Health Claims Act, Md. Code. Ann., Health-Gen. § 2-601, *et seq.*; the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5A *et seq.*; the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601, *et seq.;* the New Jersey False Claims Act, N.J. Stat. Ann.§ 2A:32C-1 *et seq.*; the New York New York False Claims Act, N.Y. State Fin. Law § 187, *et seq.*; the North Carolina False Claims Act, N.C.G.S.A. §1-605 *et seq.*; the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. § 36.001 *et seq.*; the Virginia Fraud Against Taxpayers Act, Va. Code § 8.01-216.1, *et seq.;* and the Washington Health Care False Claims Act, Wash. Rev. Code § 74.66 *et seq.*

2.     Miraca is a provider of clinical pathology laboratory services; that is, they receive tissue or fluid samples from physicians, analyze them for disease, and report the results back to the doctor.  Modernizing Medicine is a developer and purveyor of electronic medical/health records ("EMR" or "EHR") software, its version of which ModMed calls "Electronic Medical Assistant" or "EMA."  Beginning in or before 2013, the defendants combined their efforts to effectuate an extensive kickback scheme.  In brief, Defendants provide valuable EMR services to physician practices for free or below fair market value in order to induce the referral of laboratory services to Miraca.

3.     Defendants have offered and continue to offer free access to sophisticated features and components of ModMed's EMR software in exchange for those physicians' referral of patients, including Medicare and Medicaid patients, to Miraca for laboratory analysis of pathology samples.

-2-

4.     EMA provides two options to physician practices. The basic option requires that the physician or her staff manually enter notes, manually retrieve pathology results from the lab and enter them into the physician's electronic chart, and submit images via fax or some external medium.  The other, more valuable, option, which is available only to those physician practices who utilize Miraca's lab services, downloads Miraca's pathology findings directly to the patient's electronic chart and allows physicians to automatically upload their clinical notes and images, including photographs of biopsy sites. Practices which do not use Miraca's lab services cannot access these enhancements.  Physicians who choose the enhanced version of EMA pay nothing more for those enhancements, but to use these features, they must refer their laboratory patients to Miraca. Otherwise, the features are not accessible via EMA.

5.     Miraca pays Modernizing Medicine for the enhanced features, and those features can be used only by Miraca referral sources.  And Modernizing Medicine refuses to make the enhanced version of its EMR software available to practitioners and groups who do not refer their pathology-lab patients to Miraca.

6.     Because the enhanced EMA features are extremely useful and attractive to practitioners, and because the costs to the practitioner are paid by Miraca, huge numbers of physicians and physician groups have switched their patient referrals to Miraca so that they could gain access to the enhanced EMA features.

7.     In addition, in concert with Modernizing Medicine, Miraca provides physicians and practice groups with extensive consulting, training and support with respect to their utilization of and billing for EMA services, and provides other practice revenue-generating enhancements, at far below fair market value, often for free, in exchange for referrals of government healthcare business.  For example, one of these incentives includes Miraca providing

on-site trainers and consultants who provide free or below-market services with respect to ModMed's EMA to referring sources. It is not uncommon for EMR vendors to provide training on their product—some may bundle training into their EMR package, other vendors may charge for different levels of training. However, it is decidedly outside the norm for a *pathology lab* to provide live, onsite, comprehensive, all-hours training on an EMR package. Unless, as here, the lab gets something valuable in return: referrals.

8.      Through these schemes, Modernizing Medicine and Miraca have engaged in a widespread, protracted, and highly-effective conspiracy to provide remuneration to physicians in violation of the Anti-Kickback Statute ("AKS") and the False Claims Acts identified herein.

## II.      JURISDICTION AND VENUE

9.      The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

10.      The Court has personal jurisdiction over the Defendants, and venue lies under 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a), because Defendants operate and transact business in this district.

11.      The allegations in this complaint have not been publicly disclosed in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party, nor in any congressional, administrative, or Government Accountability Office, or other Federal report, hearing, audit, or investigation, or in the news media.

12.      Relator is an original source of the information upon which this complaint is based, as that phrase is used in the False Claims Act. 31 U.S.C. § 3730(e)(4)(B) and the similar laws of the Plaintiff States.

-4-

13.     Relator disclosed the allegations of this complaint to the United States prior to filing this complaint under the False Claims Act.

## III.   PARTIES

14.     The real parties in interest to the claims in this action are the United States of America and the Plaintiff States.

15.     Relator LPF, LLC is a Delaware limited liability company.

16.     Miraca Life Sciences, Inc. is a Delaware corporation headquartered in Texas. It is a subsidiary of Miraca Holdings, Inc., which, according to Miraca's website, is "Japan's largest clinical pathology diagnostics and laboratory testing service provider," with net sales well over one billion dollars yearly. Miraca markets itself as "the nation's largest independent anatomic pathology lab," and it serves physician practices nationwide.

17.     Modernizing Medicine, Inc. is a Delaware corporation headquartered in Florida. The company's main product is EMA ("Electronic Medical Assistant"), which is a cloud-based electronic health records system targeted to certain specialties. EMA has been tremendously successful: According to Modernizing Medicine's website, over 9,000 physician practices nationwide use EMA for their EHR management.

## IV.   RULE 9(B), FED. R. CIV. P. ALLEGATIONS

18.     Some of the documentary evidence necessary to prove the allegations in this complaint, such as the documents related to claims submitted to the government healthcare programs, is in the possession of either the physician practices, the Defendants, the United States, or the States.

19.     With respect to each allegation made upon information and belief, Relator has, based upon knowledge, data, and experience, a reasoned factual basis to make the allegation but lacks complete details of it.

20.     Relator is familiar with Defendants' schemes because, inter alia, Relator has personal knowledge of the schemes and of many of the customers Defendants have targeted with the schemes detailed herein. Relator also has detailed knowledge of the day-to-day marketing and business practices of Defendants. Because of Relator's personal knowledge of the Defendants and the industry, Relator has documentation and other corroborating evidence of Defendants' solicitations of illegal referral arrangements.

## V.     APPLICABLE LAWS AND GUIDANCE

### A.     The Anti-Kickback Statute

21.     Compliance with the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) (AKS), is a material condition of payment under government healthcare programs.

22.     The AKS arose out of congressional concern that payoffs to those who can influence healthcare decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of the program from these difficult to detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse

Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

23.     The Anti-kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare, Medicaid and TRICARE programs.

24.     Offering or paying remuneration of any kind violates the statute if one of the purposes of payment is to induce referrals.

25.     The term "remuneration" includes anything of value, in whatever form, whether in cash or in kind, offered directly or indirectly.

26.     Remuneration offered or paid in return to physicians in return for the physicians' promises to refer patient services—including laboratory services--to a particular facility qualifies as kickbacks, as does providing opportunities for cost-saving and/or opportunities to earn money in exchange for such referrals.

27.     Claims submitted or caused to be submitted which result from kickback-tainted relationships are false claims under the False Claims Act. 42 U.S.C. § 1320a-7b(g). Violation of the statute also may subject the participants in the kickback transactions to exclusion from participation in federal health care programs, 42 U.S.C. § 1320a-7(b)(7), and civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid, 42 U.S.C. § 1320a-7a(a)(7).

**B.      The False Claims Act**

28.     The False Claims Act prohibits, *inter alia,* (a) knowingly presenting or causing to be presented a false or fraudulent claim; (b) knowingly making, using, or causing to be made or

used, a false record or statement material to a false or fraudulent claim; and (c) conspiring to violate either of the preceding provisions. 31 U.S.C. § 3729(a)(1)(A)-(C). Any person who violates the FCA is liable for treble the amount of damages sustained by the United States and plus civil penalties. Those penalties are $5,500 to $11,000 per false claim until August 2016, after which the penalties will be between $10,781 and $21,563 per false claim.

29.     The FCA defines "knowingly" as "hav[ing] actual knowledge of the information," "act[ing] in deliberate ignorance of the truth or falsity of the information," or "act[ing] in reckless disregard of the information." 31 U.S.C. § 3729(b)(1). It requires no proof of specific intent to defraud." *Id.*

30.     The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

**C.  OIG Guidance**

31.     On April 1, 2014, the Office of Inspector General for the United States Department of Health and Human Services (the "OIG") issued Advisory Opinion 14-03 ("Opinion 14-03"). The OIG found that the proposed arrangement at issue generated prohibited remuneration under the AKS.

32.     In the proposed arrangement reviewed in Opinion 14-03, referring physicians would have been able to use the EMR provider's EMR service to generate and transmit orders to, and receive results from, the laboratory through a bi-directional interface. When a referring physician would create an order for a clinical laboratory test using the EMR provider's service, the lab would be displayed as "in network." Accordingly, the lab would pay the EMR provider a per-order fee for each test a referring physician ordered from the lab. For each test ordered from an out-of-network lab, the EMR provider would charge the physician up to $1.00, but if the test

-8-

was ordered from the "in network" lab, no such transmission fee would be charged to the physician. Instead, the lab would pay the per-order fee, but only if the physician sent the test order to the lab using the EMR provider's EMR service. The referring physicians, therefore, had the option to pay a transmission fee or to avoid paying, "with the determinative factor being the Referring Physicians' choice of laboratory." Opinion 14-03 at 6. Further, the per-order fees decreased as the number of tests the EMR provider transmitted to the lab increased.

33.    The Inspector General found that the arrangement implicated the AKS because referring physicians were relieved of a financial obligation if they referred their lab tests to the "in network" lab. That remuneration could influence a referring physician's medical decision-making, with the risk increasing as the number of referrals increased. The OIG concluded that the proposed arrangement allowed the lab to do indirectly what it could not do directly: pay compensation to referring physicians by relieving them of a financial obligation in return for the referral by those physicians of tests to the "in network" lab. Opinion 14-03 at 6.

## VI.    FACTUAL ALLEGATIONS

34.    Defendant Miraca Life Sciences employs a variety of inducements to secure referrals from physician practices, all in an effort to increase its government healthcare business.

35.    Often, but not always, those schemes result from agreements between ModMed and Miraca, which are designed to and do result in increased physician referrals to Miraca.

### A.    **Defendants provide sophisticated, advanced medical records functions to, but only to, physicians who agree to refer their patients to Miraca.**

36.    ModMed introduced EMA dermatology (its first targeted practice area) in 2010.

-9-

37.     EMA's success was impressive. For example, ModMed's revenue grew by 1,494 percent in 2014, propelling ModMed to number 57 on Deloitte's 2015 list of 500 fastest growing technology, media, telecom, life sciences, and energy tech companies in North America.[1]

38.     ModMed markets EMA as an intuitive program for medical records management. Iterations of the program are customized to specific physician practice areas, and the software can be customized to the practitioner's needs.

39.     The standard EMA package includes "intelligent coding," where the software program assigns codes and generates a bill as the provider enters exam notes.

40.     As relevant here, the capabilities of EMA include three features which are especially useful for physicians and their staff.

- *First,* the physician is able to electronically transfer attachments with each referral of a pathology sample to Miraca. These attachments include patient details (age, gender, ethnicity, past medical history, allergies, medications); visit notes; expanded morphology (that is, the form and structure of the sample site); and clinical photos of the sample site. This information is all transmitted directly to the laboratory under the Miraca-enhanced version of EMA; otherwise, it must be done by taking a photograph and either e-mailing it, or printing and faxing it, to the lab.

- *Second,* the laboratory is able to electronically transmit lab results directly to the practitioner, where they are populated automatically into the patient's electronic medical record. This automated transmission of lab findings means that the correct result is automatically attached to the correct patient for the correct visit date, and the results are immediately available in the pathology log.

- *Third,* automated diagnosis entry provides prepopulated result, action, and plan for the physician.

41.     Miraca and ModMed worked together to create these enhanced EMA features, which provide considerable ease of use, and savings of time and expense of both staff and

---

[1] https://www.modmed.com/modernizing-medicine-ranked-number-57-fastest-growing-company-in-north-america-on-deloittes-2015-technology-fast-500/

physician time, and implicate critical patient care issues. They are marketed by both Miraca and ModMed to physician practices accordingly.

42.     These enhanced features of ModMed's EMA are available only to physicians who refer their patients to Miraca.

43.     Miraca and ModMed inform physician practices that if, but only if, they refer their patients to Miraca for anatomic pathology laboratory services, they will have access to these enhanced features. Physicians who choose to refer their patients to any other laboratory—even labs with whom the physicians have established, trusted relationships—cannot use these features.

44.     ModMed and Miraca work in concert to ensure that their arrangement is successful. For example, a dermatology practice in Waterville, Maine purchased EMA from a ModMed sales representative named Lindsay Werner, in the fall of 2015. Consistent with the Defendants' practice, Werner forwarded the practice's contact information to a Miraca sales representative, Tim McAndrew.

45.     Miraca, through McAndrew, marketed, to the Waterville group, the enhanced features and consulting services available to EMA users who choose Miraca for pathology-lab services.  Relevant portions of McAndrew's e-mailed sales pitch follow:

> I wanted to reach out to you and introduce myself; my name is Tim McAndrew and I work for Miraca Life Sciences, a strategic partner with Modernizing Medicine.  I received your contact information from Lindsay at Modernizing Medicine who alerted me of your plans to implement EMA.  We are a full service laboratory located in Newton, MA and currently provide pathology services to numerous Maine Dermatology and GI clients.
>
> ***
>
> In addition to our quality pathology, we have consulting services, EMA interfacing capabilities and workflow enhancements that are unsurpassed

in the lab industry. We offer our clients access to our fulltime Meaningful Use Consultants to assist in attesting for MU and PQRS. Our consultants also provide security-risk assessments and guidance on ICD-10 changeover, CMS penalties and MU audits. Once a client selects EMA as their EMR, Miraca's technology team provides the following value and service:

- Onsite EMA go-live training, configuration, work flow analysis and ongoing support to office staff & providers

- Supply and install pathology work stations (Monitor/PC/keyboard), EMA wireless requisition printers & customized EMA requisition paper

- Exclusive access and instruction on our proprietary bi-directional orders/results interface.

- Onsite assistance and tutorials on how to achieve MU/PQRS measures within EMA

We have forged a strategic partnership with Modernizing Medicine due to their willingness to innovate along with their shear growth and popularity in the marketplace. Our technology team is comprised of certified EMA trainers who will work with your office to increase productivity and ensure our clients utilize the software to its fullest capabilities.

I would love the opportunity to schedule a meeting to talk more about the technological advantages and consulting services that we can provide to your practice. I have attached a couple brochures on our exclusive interfacing capabilities with EMA along with a general overview of our technology offerings.

I wish you tons of success with EMA at your practice! Please let me know if I can help in any way.

46.     The brochures attached to McAndrew's correspondence tout the interconnected-ness of Miraca and ModMed, asserting that the two have "partnered" to "offer an enhanced pathology interface," as well as that the "unique" Miraca features of EMA save practices time through automation.

47.     The enhanced features, which are available only to those doctors who select Miraca as the lab to which they refer their patients (and for which Miraca pays), confer financial

-12-

benefits upon the physicians who agree to the inducement concocted by Miraca in conjunction with ModMed. For example, if a physician group agrees to refer its patients' specimens to Miraca, the group immediately saves the expense associated with staff time no longer needed for manually logging or filing information into the patients' charts and then into the pathology log, because that is automatically done for all patients whose specimens are sent to Miraca.

48.     This happens each time a patient is (by virtue of the patient's specimen being sent for analysis) referred to Miraca.  That is, when a physician creates an order for a laboratory test using EMA, the physician has the option of selecting which lab will run the test. If the physician decides to refer the patient to Miraca, the enhanced features are enabled for that order. In contrast, if the physician selects a different laboratory, none of those enhanced features is available. In short, the only way a physician can obtain the enhanced software features, save money on staff and physician time, and increase patient care, is to select Miraca as the pathology lab through ModMed's EMA platform.

49.     The physician practice does not incur a fee for access to the enhanced features by selecting Miraca as its lab. Rather, Miraca pays ModMed a per-click fee for each lab ordered via EMA, and does not pass this fee on to the referring physician practices.

50.     EMA-utilizing physician groups are provided remuneration to refer all laboratory services, including services reimbursable by government healthcare programs, to Miraca so they can benefit—for free—from ModMed's enhanced EMA software features, saving the practices significant time and labor costs.

51.     This arrangement is similar to one ruled unacceptable by the Office of Inspector General in Advisory Opinion 14-03. There, the proposed arrangement would have allowed physicians to use the EHR provider's service to generate and transmit orders to, and receive

-13-

results from, "Lab A" through a bi-directional interface. For each test a physician practice sent to a different laboratory, the EHR provider would charge the physician up to $1.00. The practice would not be charged a fee if the test was sent to Lab A. As described by the OIG, the referring physician had the option to pay or avoid the fee, "with the determinative factor being the [physician's] choice of laboratory." The OIG determined that this "fee structure could potentially influence the [physicians'] referral decisions in a material way," and found the arrangement to potentially generate prohibited remuneration and that it posed "more than a minimal risk of fraud and abuse under the anti-kickback statute."

52.     Here, as in the case addressed in Advisory Opinion 14-03, Defendants' arrangement allows Miraca "to do indirectly what it cannot do directly; that is to pay compensation to [physician practices] by relieving them of a financial obligation [i.e., staff and physician time], in return for [their] laboratory test referrals."

53.     This arrangement has been successful for both Miraca and ModMed.  In 2015, Miraca handled approximately 650,000 dermatopathology cases, representing 32% growth from 2014. Nearly all of Miraca's growth results from practices using EMA. The majority of those practices were new to Miraca, but some were existing Miraca customers who migrated to EMA and began referring more specimens to Miraca.

   **B.  Miraca impermissibly provides free or below-market-value software training and support to physician practices that switch to Miraca.**

54.     The arrangements between ModMed, Miraca, and their physician-practice customers go beyond remuneration in the form of staff time and labor cost savings to physician practices and the provision of free enhanced EMR features. Miraca also provides free training, supervision of EMA launches, and guided implementation of EMA to any physician practice that switches to Miraca in connection with the practice's use of EMA.

-14-

55.     Dramatically departing from the industry norms, rather than invest in the provision of substantive training regarding its own product, ModMed trained a cadre of approximately 20 Miraca employees, called Technical Account Specialists. These Miraca employees are deployed nationwide by Miraca to provide personalized, detailed, comprehensive training and support onsite to physician practices on the use of ModMed's EMA and, while there, function as Miraca sales representatives. When physician practices contact ModMed for training support, they are directed to cursory and often woefully inadequate online videos and tutorials and referred to Miraca, because, according to ModMed, Miraca will handle all training needs for the practices, and all the practices have to do is switch their patient referrals to Miraca.

56.     The marketing brochures sent to practices that purchase EMA highlight the fact that Miraca provides training: "Miraca provides on-site pathology implementation, configuration, training and support," noting that "Miraca Technical Account Specialists have received in-depth training from Modernizing Medicine."

57.     ModMed and Miraca work hand-in-glove to increase sales of EMA and physician referrals to Miraca. For example, ModMed provides Miraca with lists of practices that have purchased EMA as well as those that might be good targets. Miraca then divides those practices between its Technical Account Specialists and its sales team. Miraca's Technical Account Specialists target the recent EMA converts with onsite, comprehensive training.

58.     Securing patient referrals from EMA-using physician practices is the primary focus of Miraca sales teams.

59.     When Miraca employees go onsite to physician practices to provide implementation and training support for EMA, one of their tasks is to configure the EMA dropdown box for lab selection to list only Miraca. Those practices that choose Miraca as their

lab receive deluxe treatment: it is not unusual for Miraca's employees to have physicians' personal cell phones (and vice-versa), and the Technical Account Specialists' consistent presence in the physicians' offices at low- to no cost is used by Miraca to induce referrals to Miraca. EMA-using practices that receive the services of Miraca's Technical Account Specialists but do not succumb to Miraca's inducements and do not send referrals to Miraca are punished: they are not prioritized by Miraca staff for training or troubleshooting and those practices' requests go to the bottom of the list.

60.     Miraca's sales team uses the target list provided by ModMed to sell both EMA and Miraca to the practice. Only when a practice is ready to complete the purchase does ModMed send one of its sales staff into the field. Otherwise, the regular contact geared toward convincing practices to purchase EMA, including regular sales calls and touting the benefits of the enhanced features and other Miraca-specific services, is provided only by Miraca's staff.

61.     To illustrate the scheme and the success of the arrangement, in May 2015, Miraca sent a Technical Account Specialist and a sales executive to a physician practice in Connecticut to assist in installing, configuring, and training staff on EMA. Those two Miraca employees spent two weeks onsite in the physician's office. Miraca did not charge the practice anything for this service. After the practice migrated to EMA, the volume of biopsies referred to Miraca by the practice approximately doubled.

62.     In 2015, a Massachusetts dermatology group decided to change EMR vendors, and was interested in EMA. The practice noted that EMA is an involved system and would require some training and support. ModMed informed the practice that if the practice returned to using Miraca as its lab, Miraca would send people to the practice to train staff and assist the practice.  ModMed stressed that even if the practice returned some of its lab work to Miraca, it

-16-

could receive some assistance. The practice contacted a competitor lab to ask whether it could offer the same help, because the practice did not want to return to Miraca but felt it had no choice if it were going to use EMA. That practice did ultimately purchase EMA but, on information and belief, did not send its specimens to Miraca because it did not want to compromise patient care by losing the services of its then-current lab.

C. **Miraca offers consulting services to physician practices at far below fair market value, in exchange for lab referrals to Miraca.**

63.     The federal government has in recent years developed a variety of incentive programs whereby healthcare providers receive payments for meeting certain quality metrics and for meeting certain criteria regarding the use of software for EHR.

64.     Miraca exploited two of these programs (PQRS and Meaningful Use) to impermissibly secure referrals of government healthcare business by offering inducements to physician practices.

65.     In 2006, the Tax Relief and Health Care Act created a 1.5% incentive payment to eligible providers who successfully submitted quality data to CMS. This has come to be known as PQRS, the Physician Quality Reporting System.

66.     In 2008, PQRS became permanent, and the incentive payment was increased to 2%. In 2010, the Affordable Care Act shifted the paradigm and created penalties for failure to submit qualifying PQRS data. Penalties increase annually, and 2014 was the last year that PQRS incentives were available. PQRS now uses negative payment adjustments to incentivize the reporting of quality data.

67.     PQRS includes hundreds of quality measures--over 280 were listed by CMS in 2015.  These address a variety of aspects of patient care, including prevention, care-coordination, procedure-related care, and resource utilization.

-17-

68.     In 2009, the Health Information Technology for Economic and Clinical Health Act, part of the American Recovery and Reinvestment Act, established the Medicare and Medicaid Electronic Health Record Initiative to provide incentive payments to eligible professionals and hospitals as they adopt, implement, upgrade, or demonstrate "meaningful use" of certified EHR technology. 42 U.S.C. § 1395w-4(o)(2)(A). Congress directed that healthcare providers show that they are using EHR technology in significant ways that can be measured both qualitatively and quantitatively. The Act established three components: The use of a certified EHR program in a meaningful manner; the electronic exchange of health information to improve quality of healthcare; and the use of certified EHR technology to submit clinical quality and other measures.

69.     In order to qualify for the incentive payments or avoid penalties, providers submit attestations of compliance to the United States.

70.     These programs made millions of dollars available to healthcare providers, but also created layers of complexity that many providers found daunting. Miraca and ModMed seized the opportunity to exploit those complexities and the compliance difficulties faced by providers, and Miraca began offering "consulting services" to help practices reach the PQRS and Meaningful Use metrics. In violation of the law, Miraca offered those services at below fair market value, and often for free, in exchange for referrals of government healthcare beneficiaries.

71.     A primary goal of these incentive programs is to increase efficiencies and quality metrics with the use of technology, making EMR providers the logical and most common providers of expertise and consulting services to practitioners. A laboratory has no legitimate interest in, and nothing to gain by, a physician practice successfully attesting to these programs.

-18-

Rather, Miraca's interest is the fact that it provides another opportunity to offer inducements to secure physicians' referrals.

72.     To effectuate this intent, Miraca offers a consulting contract to physician practices wanting its on-site consultation services for a discrete number of consulting hours for a small fee. Such contracts are shams, because Miraca provides far more consulting services than the contract specifies and also routinely does not collect the fee from practices which refer their patients to Miraca.

73.     For example, a physician group in New Jersey switched to Miraca in the spring of 2015 solely because ModMed referred the practice to the local Miraca sales representatives. Those sales representatives visited the practice and said they could provide consulting services, coming on-site for about a week to help the practice with its Meaningful Use and PQRS maintenance. The sales representatives also informed the practice that they had the ear of ModMed's president, implying they could influence the company if the practice needed it.

74.     That practice received the week of on-site consultation from Miraca staff and was never billed by Miraca for that service. The practice has continued to send its specimens to Miraca solely because of its relationship with Modernizing Medicine, despite not being pleased with Miraca's overall service, and has never been charged for or paid for Miraca's consulting services.

75.     Even taken at face value, Miraca's contract for consulting services demonstrates the impermissibility of its referral arrangements with physician practices because it dramatically undervalues in time what is necessary for effective consulting services.

76.     The contract reads, in relevant part,

Client wishes to apply for government incentives outlined in the Medicare Electronic Health Record Incentive Program as well as government incentives available through the Physician Quality Reporting System.

MLS has technical workflow specialists to assist practices in planning, designing and implementing workflow solutions in order to capture reportable data elements associated with [the above].

Client wishes to engage MLS to provide workflow consultation and other services related to achieving incentive payments…

\*\*\*

Miraca estimates it will take no more than 10 hours of consulting at $150/hour, with half due upfront and half due at attestation. The training includes training relevant staff on the requirements to participate in the MU and PQRS programs, including: Providing instruction to the provider on how to qualify and how to register, workflow analysis to identify staff responsible for activities in the workflow of the practice, provide instruction on the program's interoperability requirements and the required software and connections to qualify, mapping of existing practice workflows as related to recording data elements necessary to qualify for the program, propose workflows to improve the ability of staff to record data elements necessary to qualify for the program, provide instruction to the provider on how to attest for the program, provide instruction to the provider on documentation demonstration qualification for the program.

\*\*\*

This is not meant to generate referrals of government business. There's a Modernizing Medicine Interface addendum to allow for the transmission of demographics, orders, scheduling and results to and from MLS. The interface may include the addition of a PC workstation, printer, label printer, all of which will be used exclusively for submitting pathology requests to MLS.

77.     Miraca thus agrees via this contract to provide ten hours of consulting services for no more than $1,500. This ten-hour contract is extremely disproportionate to the amount of hours actually provided by Miraca to physician practices, and it is substantially less than what a typical physician practice would require of a Meaningful Use or PQRS consultant. Relator has personal knowledge that a minimum of 40 hours of consulting services is necessary for even a tech-savvy and cooperative customer to reach the place of being ready for Meaningful Use alone. Miraca

sends its employees to physician offices for unlimited hours and does not charge for most of that time. Miraca sends employees onsite to physician offices for extended periods of time. They are accessible to physicians and their staff day and night, and those Miraca employees rotate through physicians' offices on a regular, sometimes biweekly, basis, in order to maintain the relationship and ingratiate the practice to Miraca. It works. Miraca gets in the door under the guise of providing services necessary to allow the physician practices to receive federal incentive money, and Miraca leaves with referrals.

78.    For example, a physician practice in Quincy, Massachusetts switched in the fall of 2015 to Miraca, away from a lab that it felt provided superior pathology services, solely to receive Miraca's assistance with the Meaningful Use and PQRS requirements. The practice stated that the switch to Miraca was necessary in order to receive the government incentive payments. In order to obtain Miraca's assistance, the practice had to agree to refer all of its patients' specimens to Miraca.

79.    Similarly, a practice in northern California had a long-standing relationship with two other labs, one of which had donated an EMR package to the practice. As part of its business strategy to target practices that already had EMR in place, Miraca pitched its Meaningful Use consulting services to the practice, which noted that was the only reason it considered working with Miraca. The practice began using Miraca's consulting services in August 2012, continued working with Miraca's staff, and finally attested to Meaningful Use in January 2013, six months—not ten hours—into the consulting relationship. The volume of the practice's test referrals to Miraca increased significantly in direct correlation to the time Miraca spent on Meaningful Use consulting.

80.     As described above, Miraca sells this sham arrangement by touting the following as services Miraca will provide to EMA-using practices:

> We offer our clients access to our fulltime Meaningful Use Consultants to assist in attesting for MU and PQRS. Our consultants also provide security-risk assessments and guidance on ICD-10 changeover, CMS penalties and MU audits. Once a client selects EMA as their EMR, Miraca's technology team provides the following value and service:
>
> •       Onsite EMA go-live training, configuration, work flow analysis and ongoing support to office staff & providers
>
> •       Supply and install pathology work stations (Monitor/PC/keyboard), EMA wireless requisition printers & customized EMA requisition paper
>
> •       Exclusive access and instruction on our proprietary bi-directional orders/results interface.
>
> •       Onsite assistance and tutorials on how to achieve MU/PQRS measures within EMA

81.     Miraca's co-conspirator, Defendant Modernizing Medicine, recognizes that the consulting services necessary for practices seeking attestation assistance require significantly more time than what Miraca charges for. Just for Meaningful Use consulting, ModMed charges $250 per provider per month for a minimum of six months of consulting, nearly all of which is only provided remotely rather than by onsite trainers.

82.     Miraca uses its Meaningful Use/PQRS consulting services as a loss leader, grossly undercharging for its services in order to get its foot in the door of physician practices. It is a calculated business strategy to poach clients from other labs, and it is often the only way Miraca can have access to practices that would otherwise not entertain switching their referrals to Miraca. And, despite offering its own Meaningful Use consulting services, ModMed refers EMA users to Miraca for Meaningful Use/PQRS consulting, because the impermissible cross-referrals mutually benefit Defendants.

-22-

83.     When practices are successfully targeted by Miraca with its training, Meaningful Use/PQRS consulting, and enhanced-features schemes over a period of many months, practices refer more lab work to Miraca, and Miraca submits those claims for payment, including to government healthcare payers. The below data are derived from patient claims to Medicare for services resulting from Miraca's schemes.

| Patient Code | Date of Service | Code Billed | Amount Billed |
|---|---|---|---|
| A1 | May 25, 2016 | 88305<br>88342 | $335<br>$280<br>Total = $615 |
| A2 | May 27, 2016 | 88305<br>88342 | $335<br>$280<br>Total = $615 |
| B1 | June 1, 2016 | 88305 | $335 |
| B2 | June 1, 2016 | 88305 | $335 |

**D.     No Safe Harbor Applies**

84.     Regulations implementing the AKS create certain safe harbors protecting payments to physicians that meet narrow conditions. *See* 42 U.S.C. § 1001.952. However, no safe harbor applies to Defendants' scheme of offering illegal incentives to physician practices in exchange for lab referrals.

85.     The Office of Inspector General for the United States Department of Health and Human Services (the "OIG")  developed a regulatory AKS safe harbor for "electronic health

-23-

records items and services" that states that remuneration, if all regulatory conditions are met, "does not include nonmonetary remuneration (consisting of items and services in the form of software or information technology and training services) necessary and used predominantly to create, maintain, transmit, or receive electronic health records." 42 C.F.R § 1001.952(y).

86.     For at least two reasons, this regulatory safe harbor does not apply.  First, as of December 27, 2013, laboratory corporations like Miraca are expressly removed from the protected donor category and disallowed from taking advantage of the safe harbor. Thus, Miraca's EMA-based enhanced features available at no cost only to practices that choose Miraca as their lab, Miraca's free or below-market EMA training, and its free or below-market consulting services are remuneration under the AKS.

87.     Prior to December 27, 2013, laboratories were part of the protected donor category. The OIG proposed in 2013 that laboratories be excluded from the protected donor category because donations from labs had been the subject of complaints of abuse, as such donations "may be more likely to be motivated by a purpose of securing future business than by a purpose of better coordinating care for beneficiaries across healthcare settings." Medicare and State Health Care Programs: Fraud and Abuse; Electronic Health Records Safe Harbor Under the Anti-Kickback Statute, 78 Fed. Reg. 79208.

88.     This concern has come to fruition with the arrangement between Miraca and the physician groups it targets with their inducements, and Miraca cannot hide behind Modernizing Medicine to escape liability.

89.     Even were Miraca a legitimate donor, the arrangement would not satisfy the safe harbor requirement that the arrangement not take into account the volume or value of referrals.

-24-

42 C.F.R § 1001.952(y)(5).[2] As a lab, Miraca's interest in providing free or below fair-market-value training to physician practices regarding a software program it does not own (or consulting to enable practices to receive additional federal money) is the referrals generated by the practices.

E. **Defendants Submitted or Caused the Submission of False Claims For Payment that Violated a Material Condition of Payment under Government Health Care Programs**

90.     Compliance with the AKS is a prerequisite to a provider's right to receive or retain reimbursement from government healthcare programs. The submission of a claim for payment for a service that resulted from a kickback prohibited by the AKS is a false or fraudulent claim under the False Claims Act, because such claims are not eligible for payment. Neither the United States nor any of the Plaintiff States would have paid such claims had they known of the kickbacks. 31 U.S.C. § 3729(a)-(b); 42 U.S.C. § 1320a-7b(b), (f), (g).

91.     At all times relevant to this action, Defendants knew that the reasonable and foreseeable consequence of their schemes would be the submission of false claims to government healthcare programs and that payment of such claims would result.

92.     Both Miraca and ModMed knew at all relevant times that Miraca bills government healthcare programs for services provided that result from EMA's enhanced features; Miraca's free or low-cost EMA training and support; and/or Miraca's free or low-cost government-funding consulting.

93.      The express purpose of Defendants' schemes is to increase Miraca's dermatopathology  market share, which benefits both Defendants: Miraca benefits by increased billing to, inter alia, government healthcare payers because Defendants' schemes result in

---

[2] This requirement was present in the pre-December 27, 2013 version of the safe harbor, so to the extent Miraca could have donated EHR training at that point, the safe harbor would not have been available.

increased physician referrals; and ModMed benefits because Miraca sells EMA to practices, including by paying ModMed a per-click fee so the Miraca-using practices can access EMA's enhanced features at no cost, and provides training and consulting services to ModMed's clients at no cost to ModMed. This is all accomplished with taxpayer money.

94.     Miraca knew that its schemes violated material conditions of payment of government healthcare programs because it knew it was not in compliance with the AKS when it was submitting claims for payment.

95.     Defendants' actions were and are a substantial factor in the submission of false claims.

96.     Defendants' conduct, if known, would be capable of influencing the Government's decision to pay these claims.

97.     Notwithstanding this knowledge, Miraca submitted, and ModMed caused the submission of, false claims for dermatopathology tests for government healthcare beneficiaries.

98.     Defendants' schemes, corporately directed, are nationwide in scope, and are ongoing.

99.     Defendants' schemes have harmed, and continue to harm, federal and state healthcare programs.

## COUNT I:  Violations of the False Claims Act

100.     The allegations in the foregoing paragraphs are re-alleged as if fully set forth herein.

101.     The False Claims Act imposes liability upon, *inter alia,* those who (a) knowingly presenting or causing to be presented a false or fraudulent claim; (b) knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim;

-26-

and (c) conspiring to violate either of the preceding provisions. 31 U.S.C. § 3729(a)(1)(A)-(C).

102. The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, makes it illegal to offer and pay remuneration to induce a person to refer business paid for in whole or in part by Federal health care programs.

103. Defendants knowingly violated and continue to violate the Anti-Kickback Statute by offering and paying illegal remuneration to physician practices to induce the referral of business to Miraca paid for by Federal and state health care programs, and all claims submitted to federal and state health care programs by Miraca or practitioners who received remuneration from defendants violate the federal and state False Claims Acts.

104. Defendants know that claims resulting from violations of the Anti-Kickback Statute are not payable by government health care programs; that such nonpayable claims are false claims under the False Claims Act; and that submitting or causing the submission of such false claims creates liability under the False Claims Act.

105. These false claims result in significant reimbursement by government healthcare programs for amounts that such programs did not owe to Miraca or the physician practices.

106. Defendants knowingly present or cause to be presented false or fraudulent claims to government healthcare programs for payment or approval, and knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim, within the meaning of 31 U.S.C. § 3729(a)(1).

107. Defendants conspired to design and implement a multi-faceted scheme, the success of which depends on offering inducements to physician practices in order to increase referrals of government healthcare beneficiaries to Defendant Miraca. Each Defendant has taken

one or more overt acts in furtherance of a conspiracy to violate the FCA, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

108.    Defendants acted and continue to act knowingly, as that term is used in the False Claims Act.

109.    The United States, unaware of Defendants' violations of the AKS and the resulting falsity of the claims submitted or caused to be submitted by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

110.    Because the United States would not have paid for services which they know to have been the result of violations of the Anti-Kickback Statute, the United States is harmed in an amount equal to the amount it has paid for the claims resulting from the violations of the AKS.

111.    The United States has been damaged, and continues to be damaged, as a result of Defendants' conduct in violation of the False Claims Act in an amount to be determined at trial.

## Count II

## Violations of State False Claims Acts

113.    The allegations in the foregoing paragraphs are re-alleged as if fully set forth herein.

114.    Relator asserts claims for treble damages and penalties under the False Claims Acts of California, Colorado, Connecticut, the District of Columbia, Florida, Georgia, Hawaii, Illinois, Louisiana, Maryland, Massachusetts, Michigan, New Jersey, New York, North Carolina, Texas, Virginia, and Washington ("Plaintiff States").

115.    The False Claims Acts of the Plaintiff States impose liability upon, inter alia, those who knowingly present or cause to be presented false claims for payment or approval, and those who make or use, or cause to be made or used, false records or statements material to a

-28-

false claim. In order to preserve brevity in this Complaint, citations to the False Claims Acts of the Plaintiff States are provided in Appendix A.

116. Compliance with federal and state healthcare laws, including the federal AKS and respective state AKSs, is a material condition of payment of claims submitted to the Medicaid Programs of the Plaintiff States. *See* Appendix A, Column 3 for the compiled citations of the Plaintiff States' anti-kickback prohibitions.

117. Defendants knowingly presented or caused false claims to be submitted to the Medicaid programs of the Plaintiff States by engaging in illegal kickback schemes, in knowing violation of material conditions of payment of those programs.

118. Defendants knowingly presented or caused false claims to be submitted to the Medicaid Programs of the Plaintiff States by knowingly engaging in a scheme to make and cause to be made material misrepresentations to government healthcare programs regarding the eligibility of claims for payment by those programs.

119. Defendants' actions, if known, would have affected the Plaintiff State Governments' decisions to pay the resulting claims.

120. Defendants' actions violated material conditions of payment under the Plaintiff States' healthcare programs.

121. The resulting claims are noncovered and nonpayable and are false claims.

122. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Plaintiff State Governments for payment or approval.

123. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the

Plaintiff State Governments to approve and pay such false and fraudulent claims.

124.     Defendants acted knowingly, as that term is used in the False Claims Acts of the named States.

125.     The Plaintiff State Governments, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continue to pay the claims that would not be paid but for Defendants' unlawful conduct.

126.     By reason of the Defendants' acts, the Plaintiff States have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator requests:

A.     That the Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States and States have sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each action in violation of 31 U.S.C. § 3729 and the state laws at issue;

B.     That in the event the United States intervenes in this action, Relator be awarded 25% of the proceeds of the action or the settlement of any such claim;

C.     That in the event any Plaintiff State intervenes in this action, Relator be awarded the maximum percentage of the proceeds of the action or the settlement of any such claim permitted by the respective Plaintiff State statute;

D.     That in the event the United States and States do not intervene in and proceed with this action, Relator be awarded 30% of the proceeds of this action or the settlement of any such claim;

E.     That Relator be awarded all costs, attorneys' fees, and litigation expenses; and

F.    That the United States, the Plaintiff States, and Relator receive all relief, both at law and in equity, to which they may reasonably appear entitled.

Respectfully submitted,

s/

Frederick M. Morgan, Jr. (pro hac pending)
Jennifer M. Verkamp (pro hac pending)
Chandra Napora (pro hac pending)
Morgan Verkamp LLC
35 East 7th Street, Suite 600
Cincinnati, OH 45202
Telephone:  (513) 651-4400
Fax: (513) 651-4405
Email: jverkamp@morganverkamp.com
          rmorgan@morganverkamp.com
          cnapora@morganverkamp.com

Stephen J. Zralek (BPR 19871)
BONE MCALLESTER NORTON PLLC
511 Union Street, Suite 1600
Nashville City Center
Nashville, Tennessee 37219
Telephone:  (615) 238-6305
szralek@bonelaw.com

*Counsel for Relator*

## DO NOT SERVE
## FALSE CLAIMS ACT COMPLAINT FILED UNDER SEAL

| Appendix A | | |
|---|---|---|
| **State** | **State FCA statute** | **State Medicaid Anti-Kickback Prohibitions** |
| California | California False Claims Act, Cal. Gov. Code § 12651(a), *et seq.* | Cal. Welfare & Inst. Code § 14107.2; Medi-Cal Provider's Manual at 2; Medi-Cal Provider Agreement ¶ 2 |
| Colorado | Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-305, *et seq.* | Colo. Code Regs. § 2505-10-8.076.1(7); Colo. Med. Asst. Prog. Manual, Gen. Provider Info. and Requirements, at 14; Colo. Med. Assist. Prog. Provider Participation Agreement §§ A, I, K, & at 24 |
| Connecticut | Connecticut False Claims Act for Medical Assistance Programs, Conn. Gen Stat. § 17b-301a, *et seq.* | Conn. Gen. Stat. § 53a-161c; Conn. Gen. Stat. § 53a-161d; Reg. Conn. State Agencies § 17-83k-1 et seq.; Conn. Med. Assist. Prog. Provider Manual, ch. 2, § 17b-262-533; Conn. Med. Assist. Prog. Provider Agreement ¶¶ 1-2, 26-31 |
| D.C. | District of Columbia False Claims Act, D.C. Code § 2-381, *et seq.* | D.C. Code § 4-802(c); Code of D.C. Muni. Reg. §§ 29-1301.1, 2; Code of D.C. Muni. Reg. § 29-1399; D.C. Dept. of Health Care Fin. Medicaid Provider Agreement at 20-21, 24 |
| Florida | Florida False Claims Act, Fla. Stat. § 68.082(2), *et seq.* | Fla. Stat. §§ 409.920(2)(a)(5), 409.907; Fla. Admin. Rule 59G-9.070(7)(p); Fla. Medicaid Provider Gen. Handbook at 2-12, 2-57; Fla. Medicaid Provider Enrollment App. at 9 |
| Georgia | Georgia False Medicaid Claims Act, Ga. Code § 49-4-168, *et seq.* | Ga. Code § 49-4-146.1; Dep't of Cmty. Health Div. of Med. Assistance, Statement of Participation § 2(A); Medicaid Manual, Part 1, Policies and Procedures for Medicaid/PeachCare for Kids, §§ 106(B), (E), (MM); 404(X); 408(B) |
| Hawaii | Hawaii False Claims Act, Haw. Rev. Stat. § 661-21(a), *et seq.* | Haw. Rev. Stat. § 346-43.5; Code of Haw. §§ 17-1704, 7-1736; Haw. Medicaid Provider Manual § 2.8.2; Haw. State Medicaid Prog. Provider Agreement and Condition of Participation, pt. B, ¶ 1 & pt. C |

Case 3:16-cv-01355   Document 1   Filed 06/13/16   Page 33 of 35 PageID #: 33

| | | |
|---|---|---|
| Illinois | Illinois False Claims Act, 740 Ill. Comp. Stat. § 175/3(a), *et seq.* | 305 Ill. Comp. Stat. § 5/8A-3(a),(b); 89 Ill. Admin. Code § 140.44(a); 89 Ill. Admin. Code. § 140.35; Handbook for Providers, ch. 100 (Gen. Policies and Procedures), § 136; Agreement for Participation: Ill. Med. Assist. Prog. ¶¶ 3, 6, 11, 16 |
| Louisiana | Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. § 46:437, *et seq.* | La. Rev. Stat. §§ 438.2, 46:437.11, -.14; 50 La. Admin. Code §§ 4145, 4147; La. Medicaid Prog. Manual §§ 1.1, 1.3; La. Provider Agreement, PE-50 Addendum § 10, 26, 27 |
| Maryland | Maryland False Health Claims Act, Md. Code. Ann., Health-Gen. § 2-601, *et seq.* | Md. Crim. Law §§ 8-511, 8-512, 8-517; Code of Md. Reg. § 10.09.36.08; Md. Med. Assist. Provider Handbook at 58, 63; Provider Agreement for Participation in Md. Med. Assist. Prog. at 1 |
| Massachusetts | Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5B, *et seq.* | Mass. Gen. Laws ch. 118E § 41; 130 Mass. Code Reg. § 450.249(b); Commonwealth of Mass. MassHealth Provider Manual Series, ch. 2, §§ 450.249, 450.261; Mass. Med. Prog. Provider Agreement and Acknowledgement of Terms of Participation § 1 |
| Michigan | Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601, *et seq.* | Mich. Comp. Laws § 400.604; Mich. Dept. of Comm. Health, Medicaid Provider Manual at 10, 47; Med. Assist. Provider Enrollment & Trading Partner Agreement § 13 |
| New Jersey | New Jersey False Claims Act, N.J. Stat. § 2A:32C-1, *et seq.* | N.J. Stat. § 30:4D-17; N.J. Admin. Code § 10:49-9-10, 10:49-11.1(d); Provider Agreement Between N.J. Dep't of Health and Senior Servs. ¶ 1 |
| New York | New York False Claims Act, N.Y. State Fin. Law § 187, *et seq.* | N.Y. Soc. Serv. Law §§ 366-d, 366-f; 18 N.Y. Codes, Rules, and Reg. §§ 518.1, 515.2; N.Y. State Medicaid Prog.: Info. for all Providers: Gen. Policy at 26-27, 63; N.Y. State Medicaid Enrollment Form at 1, 8 |
| North Carolina | North Carolina False Claims Act, N.C. Gen. Stat. § 1-605, *et seq.* | N.C. Gen. Stat. § 108A-63(g); 10A N.C. Admin Code §§ 22F.0201, 22F.0602, 22F.0604; N.C. DHHS Provider Admin. Participation Agreement § 5(l) |

| Texas | Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.002, *et seq.* | Tex. Occ. Code § 102.001 *et seq.*; 1 Tex. Admin. Code §§ 371.27, 371.1707, 371.1709, 317.1711, 317.1713; Tex. Provider Procedures Manual, vol. 1, at 1-36, 1-37 – 1-42; Tex. Medicaid Provider Enrollment App. at 3-1 – 3-2, 3-5 |
|---|---|---|
| Virginia | Virginia Fraud Against Taxpayers Act, Va. Code § 8.01-216.1, *et seq.* | Va. Code § 32.1-315; 12 Va. Admin. Code § 30-10-690; Va. Dept. of Med. Assist. Serv. Provider Manual for Independent Laboratories, ch. 1, at 20 & Appx. A at 12; Commonwealth of Va. Dept. of Med. Assist. Serv. Med. Assist. Program: Independent Laboratory Participation Agreement § 8 |
| Washington | Washington Health Care False Claims Act, Wash. Rev. Code § 74.66 *et seq.* | Wash. Rev. Code § 74.09.240(1)(b); Wash. Admin. Code § 182-502-0016; Wash. State Health Care Authority Core Provider Agreement § 1; Wash. State Health Care Authority, Physician-related Servs. / Heath Care Prof. Servs. Provider Guide, 38 |